**Steven B. PENNELL, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Oct. 16, 1991.
Decided: Dec. 18, 1991.

Kathleen M. Jennings and Peter N. Letang, Dept. of Justice, Wilmington, for the State.

Before CHRISTIE, C.J., MOORE and WALSH, JJ.

MOORE, Justice.

The appellant, Steven B. Pennell ("Pennell"), was indicted and tried on three counts of first degree murder. The State claimed that these were "serial" murders. Pennell was convicted on two of those counts, but the jury was unable to reach a verdict on the third count. The jury imposed two life sentences on the defendant.

Pennell claims that: (a) the trial court abused its discretion in denying his motion for a mistrial based upon remarks made by the prosecutor in her final summation to the jury; (b) the trial court abused its discretion by admitting evidence concerning the disappearance of a prostitute in the area where Pennell's victims were allegedly abducted; (c) the search of Pennell's van, and the seizure of blue fibers therefrom, violated the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 6 of the Delaware Constitution regarding unreasonable searches and seizures; (d) the trial court abused its discretion in allowing an F.B.I. Agent to testify as an expert on serial murders; and (e) there was insufficient evidence to support the conviction for first degree murder for the death of one of the victims, Shirley Ellis.

We find no merit to Pennell's claims and affirm his convictions.

### I.

On November 29, 1987, a woman's body was discovered and identified as Shirley Ellis ("Ellis"). She was known by police to be a prostitute. At the scene, the police found the victim wearing a pair of aqua blue pants. There was black duct tape in her hair. Ellis' injuries were extensive, including ligature strangulation marks around her neck, numerous skull lacerations consistent with being struck by a hammer, wrist injuries suggestive of bind-

Eugene J. Maurer, Jr., Wilmington, for appellant.

ing and pattern bruising to the left breast and nipple. The Medical Examiner determined that Ellis' death was caused by strangulation and blunt force head trauma.

On June 29, 1988, the nude body of Catherine DiMauro ("DiMauro"), a known prostitute, was discovered at a construction site. Numerous blue fibers were collected from her body and two red fibers were removed from her face. In addition, a piece of duct tape was removed from DiMauro's hair. The injuries to DiMauro were very similar to those suffered by Ellis. Moreover, the Medical Examiner determined that DiMauro's death was caused by multiple blunt force injuries and strangulation—the identical causes of Ellis' death.

As a consequence of the Ellis and DiMauro murders, in July, 1988 the police began a decoy operation along a highway corridor which the victims were known to frequent. As part of the operation, female police officers wearing hidden microphones were dressed as prostitutes and engaged in conversations with men who stopped for them. The officers were not permitted to enter the vehicles of these men.

On August 22, 1988, another prostitute, Margaret Finner ("Finner"), was reported missing. She was last seen entering a blue van, which was described as having no side window and rounded headlights. This information was incorporated by police into their investigation and decoy operation. Finner was eventually found murdered, but there was insufficient evidence linking Pennell to the crime.

On September 14, 1988, Officer Renee Lano ("Lano") was working as a decoy along Route 40 when she observed a blue van cruise past her seven times. Officer Lano called in the tag number of the van and learned that it was registered to Pennell. After Lano moved to a darker area of Route 40, the blue van stopped for her. The driver motioned for Lano to enter the van. Lano approached, but did not enter the van. She spoke with the driver, who was later identified as Pennell. During the conversation Lano became suspicious of Pennell and noticed that the interior of his van was covered with blue carpeting.

Aware that blue fibers were found covering DiMauro's body, Lano surreptitiously removed some blue fibers from the door jamb of Pennell's van.

On September 20, 1988, the body of a young woman was discovered on rocks by the Chesapeake and Delaware Canal. The body was identified as Michelle Gordon, known to police as a prostitute. The Medical Examiner concluded that Gordon was the victim of a homicide, but because her body had been submerged in water, no determination could be made as to the cause of death. Injuries inflicted on Gordon's body were very similar to those found on both Ellis and DiMauro.

The police began surveillance of the defendant. Pennell was observed repeatedly cruising the same area of the highway corridor that was the site of the decoy. On September 30, 1988, the police stopped Pennell for a traffic offense. A search of his van uncovered a blood stain. Blue fibers and swatches of red cloth were taken from the van. Search warrants were subsequently issued for Pennell's trailer, shed, vehicles and person. Pursuant to these warrants, police seized a buck knife which was in the defendant's pocket, eight pairs of pliers, a bag of unused flexicuffs and two rolls of duct tape.

Pennell was charged with first degree murder for the deaths of Shirley Ellis, Catherine DiMauro and Michelle Gordon. The defense, essentially, was one of alibi. The trial began on September 26, 1989, and lasted over two months. As part of its case in chief, regarding the "serial" aspect of the murders, the State was permitted to introduce evidence of the disappearance of a woman named Margaret Finner. The jury, however, did not know Finner's name or that she was eventually found murdered. Agent John Douglas, Director of the F.B.I.'s Behavioral Sciences Unit, testified as an expert in the area of serial murders. After reviewing the deaths of Ellis, DiMauro and Gordon, he opined that they were all committed by the same person.

During the State's closing arguments the prosecutor attacked the defendant's credibility, stood in front of him and said:

> Mr. Maurer told you in the opening statement in their cases, many, many weeks ago, that he stood behind his client. Ladies and Gentlemen, I stand in front of him and I say, Steven Brian Pennell, you murdered Shirley Ellis, you murdered Cathy DiMauro, and you murdered Michelle Gordon ... Ladies and Gentlemen, please find him guilty.

Defense counsel immediately objected to this statement and moved for a mistrial on the grounds of prosecutorial misconduct. The court denied the request for a mistrial, struck the statement from the record, and instructed the jury to totally disregard the prosecutor's comments.

After lengthy deliberations the jury returned its guilty verdicts as to the deaths of Ellis and DiMauro.[1]

## II.

Pennell first complains of the prosecutor's interjection of her personal beliefs as to his guilt. Clearly, those comments, as the State readily concedes, were inappropriate. We do not, however, believe that they adversely affected the defendant's right to a fair trial.

All parties, and the Court, agree that arguments in the first person should be avoided. Section 5.8(b) of the ABA Standards, the Prosecution and Defense Functions, states that "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." This Court has adopted that standard. *See Hughes v. State*, Del.Supr., 437 A.2d 559, 567 (1981). The prosecutor's expression of a personal belief concerning the guilt of the accused may convey the impression that there is evidence not presented to the jury, but known to the prosecutor, which supports the charges against the defendant. *United States v. Young*, 470 U.S. 1, 18, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985).

The State suggests that the prosecutor's comments were an "invited reply" to allegedly improper comments made by defense counsel in his opening statement that "I stand behind" the defendant.[2] The "invited reply" or "invited response" doctrine is utilized in situations where an improper defense argument provokes a prosecutor to respond likewise. *See Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). Because we find that Pennell was not prejudiced by the prosecutor's remarks, which were promptly corrected by the trial judge, we need not decide whether they were an invited response to defense counsel's inappropriately phrased opening remarks. However, we note that the improper defense comment was not objected to and occurred over two months before the State's summation. Moreover, we recognize that improper arguments by both the prosecution and defense counsel do not make for a right result. *See United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985); *Michael v. State*, Del.Supr., 529 A.2d 752, 762–64 (1987).

Once a prosecutor's remarks are found to be improper, the inquiry does not end. The Court must consider whether the remark prejudicially affected the defendant's right to a fair trial. *Sexton v. State*, Del.Supr., 397 A.2d 540, 544 (1979). The three factors to be considered in making this determination are: 1) the closeness of the case, 2) the centrality of the issue, and 3) the steps taken to mitigate the effects of the error. *Hughes v. State*, 437 A.2d at

---

1. Subsequent to the oral argument in this case, Pennell pled nolo contendre to first degree murder for the death of Gordon, and has been sentenced to death. He seeks to waive all appeals regarding that sentence.

2. At oral argument, defendant's counsel stated that his remark of "standing behind" the defendant was only a reference to his physical position in the courtroom. While we accept that representation for present purposes, we are not unmindful of the subliminal effect such a statement may have upon a jury or any other reasonable person as suggesting counsel's belief in the innocence of his client. Thus, as made, we consider it inappropriate under all circumstances.

571 (quoting *Dyson v. U.S.*, D.C.App., 418 A.2d 127, 132 (1980)).

Applying this standard convinces us that Pennell was not denied his right to a fair trial. The case against Pennell was not close. Concerning the DiMauro murder, there was substantial physical and circumstantial evidence linking Pennell to the crime. DNA and fiber testing inextricably tied the defendant to DiMauro. In addition, other evidence such as the duct tape and pliers were found in Pennell's possession. The evidence linking Pennell to the Ellis murder also was substantial, even though Ellis was murdered almost a year prior to Pennell's arrest. A thread, matching the pants Ellis was wearing when her body was found, was discovered in the defendant's buck knife, and the duct tape found in her hair was of a special type used by those in Pennell's occupation. Moreover, an expert witness opined that, due to the extremely unusual nature of the injuries inflicted upon the victims, they were all murdered by the same person. This was strong evidence which tied Pennell to Ellis' murder.

Pennell relies upon *Hughes v. State*, Del. Supr., 437 A.2d 559 (1981), a case in which this Court reversed a conviction based upon a prosecutor's comments. However, *Hughes* is clearly distinguishable from the case at bar. In *Hughes*, the prosecution repeatedly referred to the defendant as a "liar" in a case "based *entirely* on circumstantial evidence." *Id.* at 571 (emphasis added). Moreover, the trial judge in *Hughes* did not give a curative instruction to the jury.

Turning to the centrality of the issue affected by the comment, it is true that the prosecutor's comment directly attacked Pennell's credibility in connection with his alibi defense. However, centrality is also affected by the length of the proceeding. Pennell's trial lasted over two months. Pennell also contends that the prosecutor's statement was compounded by the fact that it came at the very end of the trial. While that is correct, the jury was immediately instructed to ignore the prosecutor's comment.

In mitigating the error, the trial judge gave the following curative instruction:

Ladies and Gentlemen, the last comment by the prosecutor was improper, in using a personal opinion or statement to you, and as such, is stricken from the record. You should totally disregard the last— the last comments that were made and the manner in which they were made.

This Court has repeatedly held that even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks. *See Kornbluth v. State*, Del.Supr., 580 A.2d 556, 561 (1990); *Brokenbrough v. State*, Del.Supr., 522 A.2d 851, 857 (1987); *Diaz v. State*, Del.Supr., 508 A.2d 861, 866 (1986). We are satisfied that the prosecutor's error was immediately and adequately cured by the trial judge, which under all the circumstances rendered the error harmless.

## III.

Pennell next contends that the trial court abused its discretion by admitting evidence of Finner's disappearance. Specifically, the defendant argues that the evidence constituted impermissible "other crimes" evidence under Delaware Rule of Evidence 404(b) ("Rule 404(b)").

As part of its case in chief, the State sought to present evidence of the disappearance of Margaret Finner. The State wanted to call Finner's father, who would testify that she had disappeared, and Edwin Thomas, who would testify that he saw Finner get into a blue van with no side windows and rounded headlights. This information was incorporated by the police into their investigation and led to Officer Lano's contact with Pennell in a van matching that description.

The defense objected, claiming that such evidence would contravene Rule 404(b) by inferring that another crime had been committed by the defendant. The State contended that the evidence was relevant to show that the police were looking for a blue van with no side windows and rounded headlights. The State claimed this evi-

dence was known by Officer Lano and was relevant in proving why she engaged the driver of a van matching that description in conversation.

The trial court agreed that the evidence was relevant, but disagreed with the State as to how the evidence should be presented. In admitting the evidence through a detective, the State was warned to "be very careful to avoid the interjection into this case of another potential criminal act." Rule 404(b) provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Of course, to trigger Rule 404(b), the State must attempt to introduce evidence of another crime, wrong or act committed by the defendant for which the defendant was not then on trial. If the detective's testimony was offered to show, or did show, another crime, wrong or act committed by Pennell, it clearly would have been inadmissible under rule 404(b). *See Getz v. State*, Del.Supr., 538 A.2d 726 (1988). The State concedes this point. However, the evidence presented was not offered to show, nor did it show, that another crime was committed by Pennell. The testimony given was that a woman working as a prostitute was seen entering a blue van, that she did not return when expected, and that this information was used by the police in their investigation. The trial court admitted the evidence to explain why the police conducted the investigation as they did, and what information they had while conducting the investigation.

Moreover, the trial court took pains to insure that the jury did not learn any information from which it could infer that Pennell had committed another crime. The jury did not know Finner's name or the fact that she was found murdered. The jury was not even aware that she *never* returned. They simply knew she did not

return when expected. The fact that Finner's disappearance was incorporated into the overall investigation simply shows that this was evidence the police had when undertaking the decoy operation. This was the purpose for which the evidence was admitted, and does not amount to "other crimes" evidence subject to Rule 404(b).

Since the proffered evidence was admissible under Rule 404(b), its admission is governed by the general relevancy Rules of Evidence. Del.R.Evid. 401, 402, 403. Under the foregoing circumstances, the evidence was clearly relevant to prove what information the police used in their investigation which led to the defendant's arrest. It is clear that the trial court carefully weighed both the probative value and prejudicial effect of the evidence. Under the circumstances the trial court did not abuse its discretion in carefully limiting the admission of evidence concerning Finner's disappearance.

### IV.

Pennell contends that taking blue fibers from his van was an unconstitutional search and seizure. The State responds that the search and seizure comes within the "plain view" exception to the warrant requirement.

The State admits that it did not have a warrant either to search Pennell's van or to seize the carpet fibers. All parties agree that the validity of Officer Lano's search and seizure depends upon whether it was within the "plain view" exception.

Such an exception to the warrant requirement was first recognized by the United States Supreme Court in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Recently, the test was modified to require only that: 1) the police officer was legally in a position to view the evidence in plain view; and 2) the incriminating nature of the evidence must be immediately apparent. *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990). Both of those criteria are met here.

Pennell argues that Officer Lano was not legally in a position to view the blue fibers which were seized. However, it is clear that Pennell, believing Officer Lano was a prostitute, invited her to enter his van. The defendant motioned for Lano to come into his van after driving past her numerous times. Thus, while standing at the doorway of the van as a result of this encounter, Officer Lano was able to see the blue carpeting that covered the interior of Pennell's van.

During part of their conversation, which was monitored at all times by other police officers via a hidden microphone worn by Ms. Lano, Pennell asked her if she was a police officer. She answered that she was not. Pennell contends that this misrepresentation vitiates the legality of her presence in the doorway of his van. Defendant relies on an Ohio Supreme Court case which held that liquor control agents who misrepresented themselves, and gained entry into a fraternity party, were not "legally" on the premises for purpose of the plain view exception. *State v. Pi Kappa Alpha Fraternity*, 23 Ohio St.3d 141, 491 N.E.2d 1129, 491 N.E.2d 1129 (1986), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). That case is contrary to well-established Supreme Court case law. *See, e.g., Lewis v. United States*, 385 U.S. 206, 210–12, 87 S.Ct. 424, 427–28, 17 L.Ed.2d 312 (1966). It should also be noted that Lano did not gain entry into a house through her alleged "deception", rather, she stood beside the open door of defendant's van under *obvious circumstances* where Pennell had a lesser expectation of privacy. *New York v. Class*, 475 U.S. 106, 112–13, 106 S.Ct. 960, 964–66, 89 L.Ed.2d 81 (1986).

■ Pennell further argues that the police did not have probable cause to seize the fibers because their evidentiary value was not immediately apparent. *Wicks v. State*, Del.Supr., 552 A.2d 462, 465 (1988) (citing *Coolidge v. New Hampshire*, 403 U.S. at 466, 91 S.Ct. at 2038). The police, however, are not required to know for a fact that an item is evidence in order to seize it. *Id.* (citing *Texas v. Brown*, 460 U.S. 730, 741–

42, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983)).

■ Officer Lano's belief was clearly sufficient for probable cause purposes. Probable cause exists if the facts would make a reasonably cautious person believe that the item in plain view is useful as evidence in a crime. *United States v. Miller*, 769 F.2d 554, 557 (9th Cir.1985); *see also State v. Phillips*, Del.Super., 366 A.2d 1203 (1976) (similar standard applied to evidence of an incriminating nature). Officer Lano's information, which led her to believe that the blue fibers from the van's carpet may be useful as evidence, was extensive. She knew that a van matching Pennell's was used in at least one abduction, and that DiMauro's body was found covered in blue fibers which are most often found in carpet. In addition, the F.B.I. had given the police a profile of the person they thought was responsible for the murders. The profile described the individual as a white male, between 25 and 35 years of age, probably in the construction or building trades and residing in the general vicinity of the crimes. In their conversation at the van, Officer Lano elicited personal information from Pennell which coincided with the F.B.I. profile.

Defendant also challenges the two subsequent searches as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, that issue is rendered moot by our conclusion upholding the validity of the seizure of the blue fibers.

### V.

Pennell argues that the trial court abused its discretion in allowing F.B.I. Agent Douglas to testify as an expert on serial murders. He contends that this was not the proper subject of expert testimony.

■ Pennell's attempt to apply the *Frye* test and its progeny to Agent Douglas' testimony is misplaced. Those cases concern the reliability, accuracy and admissibility of certain scientific tests. *See, e.g., Frye v. United States*, 293 F. 1013 (D.C.App.1923) (lie-detector test); *Whalen*

*v. State,* Del.Supr., 434 A.2d 1346 (1980), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982) (sperm test); *State v. Moore,* Del.Super., 307 A.2d 548 (1973) (breathalyzer test). Agent Douglas, on the other hand, was providing an expert opinion based upon his knowledge and experience in the field of crime analysis. This Court has held that when an expert's opinion is based solely upon his own knowledge and experience, the *Frye* test has no application. *Bass v. State,* Del.Supr., No. 14, 1984, Horsey, J., slip op. at 6 (Sept. 20, 1985) [505 A.2d 451 (table)] (expert comparing hair samples).

■ The admissibility of Agent Douglas' opinion, therefore, is governed by Delaware Rule of Evidence 702 ("Rule 702") which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

This Court has held that knowledge is "specialized" only when not possessed by the average trier of fact. *Wheat v. State,* Del.Supr., 527 A.2d 269, 272 (1987). Douglas' extensive experience with signature crimes and crime analysis was specialized, and if accepted by the jury, could be helpful to it in understanding behavior unknown to the general public. *See id.* (expert witness permitted to testify on behavior of intrafamily sexual abuse victims); *see also United States v. Rogers,* 769 F.2d 1418 (9th Cir.1985) (allowing F.B.I. agent to testify as to "signature" aspects of bank robberies for which the defendant was charged). Whether all three murders were committed by the same person was clearly a "fact in issue" for purposes of Rule 702. In addition, Agent Douglas was unquestionably qualified as an expert. Accordingly, the trial court properly found his testimony to be admissible opinion testimony under Rule 702.

■ Pennell also contends that Agent Douglas' testimony went beyond the scope of the trial court's ruling. The trial court permitted Agent Douglas to testify as to the "signature" aspects of the crime, but would not allow the introduction of "profile" evidence. "Profile" evidence is that which attempts to link the general characteristics of serial murderers to specific characteristics of the defendant. Such evidence is of little probative value and extremely prejudicial to the defendant since he is, in a sense, being accused by a witness who was not present at any of the crimes.

Defendant argues that Douglas' testimony that the perpetrator was "not youthful" impermissibly implicated Pennell, who then was 32 years old. Upon examining the context of the comment, however, we are satisfied that Douglas' statement was not improper. Douglas noted the sophistication of the crimes, which tended to negate their commission by an inexperienced youth. Thus, he stated: "we are not talking about, well, a youthful type of offender." "Youthful" was in reference to the criminal experience of the perpetrator rather than his age. Moreover, Douglas never gave an age range for the offender and "youthful" is open to numerous interpretations. Thus, under all of the circumstances we are satisfied that Douglas did not impermissibly interject "profile" evidence into the case.

## VI.

■ Finally, Pennell asserts that there was insufficient evidence to support his conviction for the death of Shirley Ellis. Our standard of review is whether the evidence, viewed in the light most favorable to the State, is such that "any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State,* Del.Supr., 539 A.2d 164 (1987).

■ A review of the record fully supports a conclusion that the evidence was sufficient to support Pennell's conviction for the Ellis murder. Such evidence includes: 1) an aqua blue cotton fiber was found in Pennell's buck knife which matched fibers found in Ellis' pants in all

microscopically significant characteristics, 2) duct tape of a type sold only to those in the building trades was found in Ellis' hair (Pennell was an electrician), 3) pliers found in Pennell's possession were identified as consistent with pinch type bruises on Ellis' abdomen. Most significantly, the injuries sustained by DiMauro and Ellis were so strikingly similar that there was expert testimony to the effect that they were inflicted by the same person. The evidence that Pennell murdered DiMauro is overwhelming. Under the foregoing circumstances we find the evidence sufficient to sustain Pennell's conviction for the murder of Shirley Ellis.

Accordingly, the judgment of the Superior Court is AFFIRMED.