**Steven B. PENNELL, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Feb. 11, 1992.
Decided: Feb. 18, 1992.

Steven B. Pennell, pro se. Joseph M. Bernstein, "stand-by" counsel, Wilmington, for defendant-appellant.

Richard E. Fairbanks, Jr. (argued), and Timothy J. Donovan, Jr., Dept. of Justice, Wilmington, for plaintiff-appellee.

Before CHRISTIE, C.J., HORSEY, MOORE, WALSH, and HOLLAND, JJ. (constituting the Court *en banc*).

HOLLAND, Justice:

The defendant-appellant, Steven B. Pennell ("Pennell"), was indicted on two separate charges of Murder in the First Degree. Pennell entered pleas of *nolo contendere*. On October 31, 1991, following a penalty hearing, the Superior Court sentenced Pennell to death by lethal injection for each crime. Pennell did not file a direct appeal.

An automatic appeal was docketed with this Court on November 1, 1991, pursuant to 11 *Del.C.* § 4209(g), and Supreme Court Rule 35.[1] In accordance with the mandate of Delaware's death penalty statute, we have reviewed the imposition of the death sentences by the Superior Court, following each of Pennell's convictions of Murder in the First Degree. 11 *Del.C.* § 4209(g). We have concluded that the judgments and sentences of the Superior Court should be affirmed.

### Procedural History

On November 8, 1991, Pennell informed the Clerk of this Court, in a hand-written letter dated November 3, 1991, "of [his] decision that no action will be started by [him] against the conviction or sentencing." Pennell also expressed his "wish to have the automatic review of the death sentence pursuant to 11 *Del.C.* § 4209(g) and Supreme Court Rule 35 commenced as soon

1. On November 4, 1991, this Court entered an order staying the execution of the sentences of death imposed by Superior Court. That order, as amended on November 6, 1991, provides that the stay of execution shall remain in effect "until the completion of this Court's judicial review of the pending appeal."

as all documents are received by this Court." That letter also stated that Pennell would "respectfully object to any counsel other than [himself] being appointed" to represent him in this Court.

On November 14, 1991, Pennell, acting *pro se*, filed a handwritten document in this Court, titled "Notice to Dismiss Appeal and Affirm Judgment." In that document, Pennell requested this Court to affirm the death sentences that had been imposed by the Superior Court "so that the proposed sentence can be carried out without delay." On November 25, 1991, the record of the proceedings in the Superior Court was filed with this Court. On December 2, 1991, this Court concluded that, in the interest of justice, this matter should be remanded to the Superior Court for an evidentiary hearing on Pennell's applications: to represent himself on appeal, *see Watson v. State*, Del.Supr., 564 A.2d 1107 (1989); to dismiss the appeal; and to affirm the judgments of the Superior Court, which had resulted in the imposition of both death sentences.

On December 19, 1991, the Superior Court conducted an evidentiary hearing in accordance with this Court's order of remand. Thereafter, on December 26, 1991, the Superior Court filed a written report of its findings dated December 20, 1991, pursuant to Supreme Court Rules 19 and 26(d)(iii). The written findings of the Superior Court carefully addressed the issues set forth in the remand by this Court.

The Superior Court found that Pennell's decision to proceed *pro se* on appeal in this Court was made knowingly and voluntarily, with a full understanding of the dangers of pursuing self-representation and the disadvantages he may encounter as a result of not having an attorney representing him on appeal. The Superior Court also found that Pennell understood the limited nature of this Court's proportionality review of a sentence of death pursuant to 11 *Del.C.* § 4209(g)(2). The Superior Court further found that Pennell realized that if his motion to affirm was granted, it would result in his execution. On January 7, 1992, this Court approved and adopted the findings of fact and conclusions of law set forth in the

Superior Court's written report dated December 20, 1991.

On January 7, 1992, based upon the Superior Court's conclusion that Pennell was fully informed of the hazards of self-representation and had voluntarily waived his right to the assistance of counsel on appeal, Pennell's request to proceed *pro se* in this Court was granted. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). This Court also granted Pennell's request to limit its examination of the proceedings in the Superior Court to the mandatory statutory review of the proportionality of the imposition of the penalty of death in each case, pursuant to 11 *Del.C.* § 4209(g)(2), (3) and (4). *See Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). The Clerk of this Court was then directed to issue a brief schedule forthwith.

On January 10, 1992, Pennell filed a hand-written motion renewing his earlier motion to dismiss the appeal and to affirm the judgment of the Superior Court, pursuant to 11 *Del.C.* 4209(g)(4)(a). In the alternative, Pennell's motion asked this Court to expedite its scheduling by proceeding "directly to oral argument without briefs," Supr.Ct.R. 25(c); or to accept his motion "in lieu of a brief." Pennell's motion stated that he waived his right to submit an opening brief under 11 *Del.C.* § 4209(g)(3).

On January 16, 1992, this Court denied Pennell's motion for summary affirmance of the death sentences imposed by the Superior Court. The choice by a defendant, who has been sentenced to death, to abandon further litigation "can be made, competently, knowingly and intelligently; and, when so made, will be honored by the courts." *State v. Bailey*, Del.Super., 519 A.2d 132, 134 (1986). *See also Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976). However, this Court determined that such waiver was precluded because of the statutory mandate in Delaware which provides: "Whenever the death penalty is imposed, and upon the judgment becoming final in the trial court, the recommendation on and imposition of that penalty *shall* be reviewed on the record by the

Delaware Supreme Court." 11 *Del.C.* § 4209(g)(1) (emphasis added).

On January 16, 1992, this Court granted Pennell's motion for expedited scheduling, and granted Pennell's request to waive the filing of an opening brief. Nevertheless, this Court requested the State to file a brief, on or before January 25, 1992, stating its position on the issues mandated to be reviewed by statute. 11 *Del.C.* § 4209(g)(2). This Court also granted Pennell the right to file a brief in response to the State's brief.

On January 16, 1992, this Court also granted Pennell's application to present oral argument. 11 *Del.C.* § 4209(g)(3). This Court also granted the State the right to present oral argument. The attorney who had been designated as "stand-by" counsel for Pennell in the Superior Court was directed to be present with Pennell at the oral argument before this Court.

On January 24, 1992, the State filed its brief. Pennell filed a handwritten reply brief on January 28, 1992. In his brief, Pennell stated that the evidence "unequivocally" supported the imposition of both sentences of death by the Superior Court. Pennell's brief reiterated his request for this Court to "affirm the death sentence without delay."

On February 11, 1992, this Court heard oral arguments by Pennell, *pro se*, and the

State.[2] Present at oral argument with Pennell was his "stand-by" attorney.[3] Pennell made a cogent and reasoned argument which requested this Court to affirm the death sentences that had been imposed upon him by the Superior Court. (Appendix II). The State agreed with Pennell's position and presented an independent oral argument requesting this Court to affirm the judgments and death sentences of the Superior Court. *Id.*

### Facts

The record of the Superior Court in this matter, including transcripts, have been filed with this Court. The record reflects that the indictments in the matter *sub judice*, charging Pennell with two counts of Murder in the First Degree, alleged that Pennell had intentionally caused the deaths of Michelle Gordon and Kathleen Meyer. Prior to his arraignment, Pennell advised the Superior Court that it was his desire to represent himself and to enter pleas of *nolo contendere* to each charge.

On August 20, 1991, the Superior Court held a hearing on Pennell's motion to represent himself. At the conclusion of that hearing, the Superior Court reserved decision on Pennell's request to proceed *pro se* and ordered an independent psychiatric evaluation of Pennell.[4] A detailed written

---

2. A videotaped record of the February 11, 1992 oral argument is on file with the Clerk of this Court.

3. Oral argument was originally scheduled for February 4, 1992. However, due to a death in the immediate family of Pennell's original "stand-by" attorney, that argument was postponed. Oral argument was rescheduled for February 11, 1992, following a remand of this case to the Superior Court to appoint a substitute "stand-by" attorney for Pennell. The record reflects that Pennell had no objection to the appointment of substitute "stand-by" counsel and requested *pro se* that oral argument be rescheduled as soon as possible by this Court.

4. The Superior Court's order specifically asked the psychiatrist who had been appointed to conduct the independent psychiatric examination of Pennell to determine the following:
 1. The defendant's ability to understand the dangers of representing his own interests at trial;

2. The defendant's ability to understand the roles of the various participants in the trial, including prosecution, judge and jury;
 3. The defendant's ability to understand court procedure;
 4. The defendant's ability to appreciate the charges against him;
 5. The defendant's ability to appreciate the range and nature of possible penalties, including, most importantly, the possible sentence of death with regard to the Murder First Degree charges;
 6. The defendant's ability to understand the purposes of a guilt phase and penalty phase of a First Degree Murder trial and his right to have a jury or a judge determine both guilt and sentence;
 7. The defendant's ability to present to a jury, or the Court, available pertinent facts concerning the offense;
 8. The defendant's ability to testify relevantly; and
 9. The defendant's motivation for desiring to offer a "no contest" plea to this charge.

psychiatric report, dated September 10, 1991, was delivered to the Superior Court and is a part of the record. That evaluation concluded with the psychiatrist's opinion that Pennell was "competent to stand trial, to represent himself and to enter a plea ..."

On October 11, 1991, the Superior Court granted Pennell's motion to represent himself. In a carefully reasoned written decision which considered, *inter alia*, the report of the psychiatrist's independent examination and the evidence presented at the August 20, 1991 hearing on Pennell's motion, the Superior Court concluded that Pennell had "knowingly, intelligently, and voluntarily waived his right to counsel and invoked his right to represent himself at trial." In that same written decision, due to what it characterized as "an abundance of caution and because of the nature of these charges," the Superior Court appointed "stand-by" counsel for Pennell "should he later need help in representing himself or to step in as counsel should it later become necessary to terminate [Pennell's] self-representation."[5] In addition to "stand-by" counsel, the Superior Court appointed an attorney to represent Pennell "for the limited purpose of handling any motions *in limine* seeking the exclusion of DNA evidence."[6]

On October 21, 1991, Pennell filed a *pro se* motion in the Superior Court to change his pleas from "not guilty" to *nolo contendere*.[7] On October 30, 1991, the Superior Court held a hearing on Pennell's motion to change his not guilty pleas. After a carefully conducted plea colloquy, the Superior Court concluded that Pennell had made a knowing and voluntary decision to enter pleas of *nolo contendere* to each charge of Murder in the First Degree and accepted those pleas.

After accepting Pennell's pleas of *nolo contendere*, the Superior Court directed the State to present evidence that would establish a *prima facie* case for each charge of Murder in the First Degree. With respect to the death of Michelle Gordon, the State introduced, without objection, the entire record of the guilt/innocence phase of a prior trial. *State v. Pennell*, Del.Supr., 602 A.2d 48 (1991). At the prior trial, a jury had convicted Pennell of Murder in the First Degree with respect to the death of Shirley Ellis and Catherine DiMauro, but had been unable to reach a unanimous verdict with respect to a charge of Murder in the First Degree involving the death of Michelle Gordon. *Id.* The Superior Court also ruled that the proceedings of the prior trial, as they related to the deaths of Ellis and DiMauro, were admissible in both the Gordon and the Meyer cases to identify the perpetrator, because the *modus operandi* of all four murders was the same. *Id.* D.R.E. 404(b). With respect to the death of Kathleen Meyer, the State presented the live testimony of Sergeant James R. Hedrick, a Supervisor in the Criminal Investigation Unit of the New Castle County Police and the live testimony of Harold A. Deadman, a Special Agent employed by the Federal Bureau of Investigation.

The State's evidence demonstrated that Kathleen Meyer was last seen alive on September 10, 1988. She left her home in Brookmont Farms off Route 40, on foot, at about 9:30 p.m. Because a missing person, Margaret Finner, was last seen entering a blue van, the police were on the look-out for such a vehicle. That evening, by chance, an off-duty police officer saw a young woman hitchhiker matching Meyer's description enter a blue van on Route 40 near the entrance to Brookmont Farms.

---

**5.** At the August 20, 1991 hearing on Pennell's motion to proceed *pro se*, Pennell had indicated that he had no objection to the appointment of "stand-by" counsel and would be willing to consult "stand-by" counsel on procedural matters.

**6.** This attorney had represented Pennell during his earlier trial and the appeal which followed. *State v. Pennell*, Del.Supr., 602 A.2d 48 (1991). Pennell had agreed to this limited appointment

of counsel during the August 20, 1991 hearing in the Superior Court.

**7.** On August 30, 1991, while the Superior Court had Pennell's motion to proceed *pro se* under advisement, with the assistance of appointed counsel, Pennell was arraigned and entered pleas of not guilty to each charge of Murder in the First Degree.

The officer made a note of the blue van's license number. It was later determined that the registered owner of the van was Steven Pennell.

The State's evidence demonstrated that Michelle Gordon's body was found on September 20, 1988 on rocks by the Chesapeake and Delaware Canal. Two days earlier Gordon had been seen entering Pennell's van on Route 40 by a witness who knew both her and Pennell. An autopsy indicated that Gordon had been bound and tortured before she died, in a manner similar to the acts relating to the murders of Ellis and DiMauro. The Medical Examiner opined that cocaine in Gordon's system may have made her heart less capable of withstanding the shock of the torture and beating she sustained. Consequently, the Medical Examiner opined that Gordon had died while she was being tortured. After Gordon's death, the perpetrator mutilated her body.

The State also presented physical and scientific evidence to connect Pennell to the murders of both Gordon and Meyer. Kathleen Meyer's body was never recovered. However, the police obtained blood samples from her father and mother. Those blood samples were submitted for DNA analysis along with the carpeting from Pennell's van. The analyst was able to isolate blood in that carpeting which was consistent with blood from a child of Kathleen Meyer's parents. The State also presented forensic evidence to connect Pennell with the murder of Michelle Gordon. Head and pubic hairs matching those of Gordon were found in Pennell's van. It was determined, after scientific analysis, that several of the head hairs had been damaged in a way that was consistent with having been struck by a blunt object. The expert opinion of the Director of the Behavioral Science Unit of the Federal Bureau of Investigation, presented during testimony at Pennell's prior trial, was that Ellis, DiMauro and Gordon had all been murdered by the same person.

Following the presentation of the State's evidence, the Superior Court determined that there was a factual basis for each of the charges of Murder in the First Degree, to which Pennell had entered a plea of *nolo contendere.* Thereafter, the Superior Court stated that it was convinced, beyond a reasonable doubt, that if the State's evidence were presented at a trial, Pennell would be found guilty as charged. As a result, the Superior Court found Pennell guilty of Murder in the First Degree with regard to the death of Michelle Gordon and the death of Kathleen Meyer.

On October 31, 1992, the Superior Court conducted a penalty hearing to determine whether Pennell should be sentenced to life imprisonment or death, with regard to each of his convictions of Murder in the First Degree the previous day. Pennell waived his right to have that determination made by a jury. Prior to the penalty hearing, the State had advised Pennell that it would seek to have a sentence of death imposed for each conviction. The State also gave Pennell written notice, prior to the penalty hearing, of the statutory and non-statutory aggravating circumstances it would seek to establish. 11 *Del.C.* § 4209(c)(1).

At the penalty hearing, without objection, the State again introduced the entire record of the guilt/innocence phase of Pennell's prior trial. *Pennell v. State,* Del. Supr., 602 A.2d 48 (1991). The State also introduced into evidence the penalty phase of that prior trial. *Id.* That record reflected that Pennell had been convicted of Murder in the First Degree with regard to the similar deaths of Shirley Ellis and Catherine DiMauro, under circumstances similar to the deaths of Gordon and Meyer. That trial record also reflected the specific manner in which Michelle Gordon had died. The State contended that the record of the prior trial, and its evidence in the present proceedings, established two statutory aggravating circumstances: first, that a course of conduct by Pennell had resulted in the death of two or more persons 11 *Del.C.* § 4209(e)(1)(k); and, second, that the murder of Michelle Gordon was outrageously or wantonly vile, horrible, or inhuman in that it involved torture. 11 *Del.C.* § 4209(e)(1)(*l*).

A non-statutory aggravating circumstance was introduced by the State in the case of Michelle Gordon. The State presented the live testimony of Marlene Simms, Michelle Gordon's mother. Marlene Simms testified as to the impact of Michelle Gordon's death upon her family. *Petition of State,* Del.Supr., 597 A.2d 1 (1991).

Pennell did not contest the State's evidence in either case and did not present any mitigating evidence during the penalty hearing. However, in a closing argument, he repeated his request to have sentences of death imposed by the Superior Court judge:

> The only thing I would like to put on the record, I believe the Court knows how I feel. The law was developed from one book and it's that book I quote from. In Numbers, Chapter 35, Verse 30, "Whoever kills a person, the person shall be put to death"—also, in Genesis, Chapter 9, Verse 6, "Whoever sheds man's blood by man, his blood shall be shed."
>
> This Court has found me guilty on testimony of witnesses, so I ask that the sentence be death as said by the State laws and God's laws. That's all I have to say.

Prior to announcing a sentencing decision, the record reflects that the Superior Court judge recessed the court and deliberated for several hours.

Later on October 31, 1991, during the mid-afternoon, the Superior Court judge announced his sentencing decision. The judge found that the State had established, beyond a reasonable doubt, two statutory aggravating circumstances: first, with respect to each conviction, that Pennell's course of conduct had resulted in the death of two or more persons, 11 *Del.C.* § 4209(e)(1)(k); and, second, that the murder of Michelle Gordon was outrageously and wantonly vile, horrible and inhuman in that it involved torture, 11 *Del.C.* § 4209(e)(1)(*l*). In mitigation, the judge found that Pennell had a supportive family and "until these incidents, been a substantial provider for his family, as well as a father and husband and son."

The Superior Court judge then weighed the aggravating factors, the mitigating factors, the circumstances of the crimes, and Pennell's character, criminal record, and propensities. The record reflects the judge's deliberative process in determining the appropriate sentence. It was, in part, as follows:

> In this case, the circumstances of the offenses are the most egregious possible. The evidence shows that in the coldly premeditated fashion, the Defendant abducted Michelle Gordon. He held her in captivity alone and afraid. He bound her hand and foot, he tortured her, he murdered her, mutilated and disposed of her body. The victim of this murder experienced terror, fear, pain and hopelessness before she died. Her suffering and death call for retribution.
>
> In the case of Kathleen Meyer, we know less of her last hours. We know only that she died at the hands of the Defendant and probably she died in his van. Her death calls for retribution. We know, too, that these are not the only victims of this Defendant.
>
> We know that he also murdered Catherine DiMauro and Shirley Ellis. It has been established beyond a reasonable doubt that the Defendant has committed these two additional murders of women who were tortured and murdered in a similar fashion similar to the fashion employed in the murder of Michelle Gordon. We know, therefore, that his propensity for violence and torture were not limited to Michelle Gordon. The Court must balance the circumstances of these two deaths, Kathleen Meyer and Michelle Gordon, against his family situation.
>
> Mr. Pennell is an intelligent individual. He has demonstrated that intelligence to the Court in these proceedings. That very intelligence makes these crimes even more reprehensible. Mr. Pennell took with him the tools necessary to bind the victims' limbs, the tools necessary to cause mutilation and kill. These were planned murders.
>
> ... The enormity of these two crimes, their cold premeditation and their callous

execution clearly outweigh any mitigating factors. The Court, therefore, concludes that the Defendant is a threat to commit additional violent acts.

Mr. Pennell has asked this Court to impose the death penalty. He states that if the Court is convinced he committed these offenses, the law of Delaware and the law of God prescribe death as the penalty. The Court makes its decision not upon that request of the Defendant. The Court makes its decision solely on the facts of these crimes and the laws of the State of Delaware.

The Superior Court judge concluded that the proper sentence for each of Pennell's convictions of Murder in the First Degree, relating to the deaths of Michelle Gordon and Kathleen Meyer, was death by lethal injection.

### Death Penalty Review

The Delaware capital punishment statute mandates this Court's review of the death sentences that were imposed upon Pennell by the Superior Court. *See Dawson v. State,* Del.Supr., 581 A.2d 1078, 1107 (1990). Although the review which the statute mandates by this Court is limited, that review is not perfunctory. *See Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). 11 *Del.C.* § 4209(g)(2) provides as follows:

(2) The Supreme Court shall limit its review under this section to the recommendation on and imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

In performing our review, in accordance with the statute, we are cognizant that "death as a punishment is unique in its severity and irrevocability." *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

█ We have traditionally commenced our mandatory statutory review by initially addressing subparagraph (b) of Section 4209(g)(2). *Dawson v. State,* 581 A.2d at 1107. Accordingly, we begin with an examination of the evidence in the record to support the findings of the Superior Court judge which relate to the establishment of statutory aggravating circumstances. 11 *Del.C.* § 4209(e). The first statutory aggravating circumstance that the Superior Court judge found to have been established by the State was that Pennell's "course of conduct resulted in the deaths of 2 or more persons. . . ." 11 *Del.C.* § 4209(e)(1)(k). The judge found that this statutory aggravating circumstance had been established with respect to both the conviction relating to the murder of Michelle Gordon and the conviction relating to the murder of Kathleen Meyer.

The record reflects that the first statutory aggravating circumstance had been established beyond a reasonable doubt, as a matter of law, by virtue of Pennell's pleas of *nolo contendere* in these cases and by the admission, without objection, of the record evidencing Pennell's prior separate convictions of two other charges of Murder in the First Degree. The latter convictions, relating to the deaths of Shirley Ellis and Catherine DiMauro, have been reviewed by this Court and are final. *State v. Pennell,* Del.Supr., 602 A.2d 48 (1991). The record also reflects, beyond a reasonable doubt, that Meyer, Gordon, Ellis and DiMauro were murdered by Pennell in a manner which established a similar "course of conduct." 11 *Del.C.* § 4209(e)(1)(k).

█ The Superior Court judge found the existence of a second statutory aggravating circumstance with regard to the conviction that related to the death of Michelle Gordon. The judge found that the murder of Michelle Gordon "was outrageously or

wantonly vile, horrible or inhuman in that it involved torture...." 11 *Del.C.* § 4209(e)(1)(*l*). In support of that finding the State introduced, without objection, the trial testimony by the State Medical Examiner. According to that testimony, Michelle Gordon died while she was being tortured.

The record reflects that the Superior Court judge properly found, beyond a reasonable doubt, the existence of one statutory aggravating circumstance with respect to the murder of Kathleen Meyer. The record also reflects that the Superior Court judge properly found, beyond a reasonable doubt, the existence of two statutory aggravating circumstances with respect to the murder of Michelle Gordon. Therefore, this Court concludes that the evidence supports the Superior Court judge's finding that the State had established beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance with respect to each of Pennell's convictions of Murder in the First Degree in the matter *sub judice*. 11 *Del.C.* §§ 4209(e)(1), (g)(2)(b).

Two additional inquiries are required by subparagraph (a) of Section 4209(g)(2): first, whether the Superior Court judge's imposition of the death penalty was either arbitrary or capricious, and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under the statute. *Dawson v. State*, 581 A.2d at 1108; *Riley v. State*, Del.Supr., 496 A.2d 997, 1026 (1985). "Each question requires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender." *Id.;* 11 *Del.C.* § 4209(g)(2). *Dawson v. State*, 581 A.2d at 1108.

■ After a careful review of the entire record, we find that Pennell's sentences of death were neither arbitrarily nor capriciously imposed by the Superior Court judge. The judge stated unequivocally that his sentencing decision was not based upon Pennell's request to have the death penalty imposed. The record reflects that the Superior Court judge carefully considered the totality of the evidence in aggravation and mitigation, which related to the particular circumstances of the murder of Michelle Gordon and the murder of Kathleen Meyer. The judge also carefully considered Pennell's character and propensities. The Superior Court judge succinctly and poignantly expressed the basis for his decision to impose the death penalty in each of the cases that are now before this Court. The record supports those decisions and reflects that each decision was the product of a deliberate, rational and logical deductive process.

■ The remaining question which we must now address, is whether the Superior Court judge's imposition of the death penalty upon Pennell in each case was disproportionate to the penalty recommended in similar cases arising under the Delaware capital punishment statute. To answer that final inquiry, this Court has reviewed the "universe" of cases established in *Flamer, Riley, DeShields,* and *Dawson,* as well as all of the subsequent cases falling therein, i.e., we have compared Pennell's sentence with the penalties in all first degree murder cases which have gone to trial and a death penalty hearing. *Dawson v. State*, 581 A.2d at 1108; *DeShields v. State*, Del. Supr., 534 A.2d 630, 649 (1987); *Riley v. State*, 496 A.2d at 1027–28; *Flamer v. State*, Del.Supr., 490 A.2d 104, 140 (1983); (Appendix I). This Court has also considered objective factors such as the gravity of the offense, the circumstances of Pennell's crimes, and the harshness of the penalty. *See Solem v. Helm*, 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983).

A definitive comparison of the "universe" of cases is almost impossible. *Dawson v. State*, 581 A.2d at 1108; *Riley v. State*, 496 A.2d at 1027; *Flamer v. State*, 490 A.2d at 144. All of the penalty hearings in the "universe" of cases which preceded Pennell's were conducted before a jury.

Individual jurors bring to their deliberations "qualities of human nature and varieties of human experience, the range of

which is unknown and perhaps unknowable." The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that "buil[d] discretion, equity, and flexibility into a legal system."

*Dawson v. State*, 581 A.2d at 1108 (citing *McClesky v. Kemp*, 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987)). In this matter, Pennell waived his right to a jury during the penalty hearing. However, the fact that Pennell was sentenced to death by a judge, rather than a jury, does not change the nature of this Court's comparative analysis.

This Court has reviewed the factual background of the applicable "universe" of cases. Pennell, like other defendants sentenced to death in Delaware, was found guilty of committing the unprovoked, cold-blooded, execution-style murders of persons who lacked the ability to defend themselves, e.g., *Dawson v. State*, 581 A.2d at 1108, *DeShields v. State*, 534 A.2d at 649, *Riley v. State*, 496 A.2d at 1027. Pennell, like other defendants sentenced to death in Delaware, was found guilty of committing each murder during a course of conduct that resulted in the death of two or more persons, e.g., *Deputy v. State*, Del.Supr., 500 A.2d 581, 602 (1985); *Bailey v. State*, Del.Supr., 490 A.2d 158, 173 (1983) and *Bailey v. State*, Del.Supr., 503 A.2d 1210, 1211 (1984); and *Flamer v. State*, 490 A.2d at 123–124.

However, this Court's review of the "universe" of cases in the context of Pennell's present appeal is unique in that the "universe" of cases includes a prior penalty hearing for Pennell which resulted in a jury being unable to recommend the imposition of a death sentence. *State v. Pennell*, Del.Supr., 602 A.2d 48 (1991). While this is a unique circumstance in Delaware's capital punishment jurisprudence, other jurisdictions expressly recognize that a judge and a jury may disagree about the appropriateness of imposing a sentence of death, even in a single proceeding. The Florida death penalty statute, for example, permits a judge to reject a jury's recommendation of life and to impose a penalty of death during a single trial. However, under that Florida statutory scheme, "in order to sustain a sentence of death [by the judge] following a jury recommendation of life, the facts suggesting a sentence of death [by the judge] should be so clear and convincing that virtually no reasonable person could differ." *Tedder v. State*, Fla.Supr., 322 So.2d 908, 910 (1975) (cited with approval by the United States Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 249, 96 S.Ct. 2960, 2965, 49 L.Ed.2d 913 (1976) and *Dobbert v. Florida*, 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977)).

This Court finds the *Tedder* analysis didactic, by analogy, for present purposes, notwithstanding the fact that the analogy is incomplete. First, we recognize that although the inability of the jury to reach a unanimous verdict during the penalty phase of Pennell's first trial resulted in the imposition of two life sentences, its indecision cannot be equated with a "recommendation" of a life sentence by the jury. Second, we recognize that Pennell's penalty hearing before a jury and his penalty hearing before the Superior Court judge were separate proceedings with a different totality of evidence.

Taking the foregoing distinctions into consideration, the facts in this record, *a fortiori*, support the decision of the Superior Court judge to impose sentences of death. The record reflects that when Pennell appeared before the Superior Court judge for sentencing, he had been convicted of *two additional* murders that were not known to the jury at his prior trial. Each of what were then a total of four murders had been committed by Pennell on separate occasions, in a similar manner, over a period of time, and with no apparent motive other than to inflict pain and death. Thus, when Pennell was sentenced for the deaths

of Kathleen Meyer and Michelle Gordon, he was unique among the "universe" of Delaware defendants because the record reflected, beyond a reasonable doubt, he was a relentless serial murderer.

The Superior Court judge carefully evaluated the totality of the circumstances reflected in the evidence of the penalty hearing. The Superior Court judge concluded that "the enormity of these two crimes (Gordon and Meyers' murders), their cold premeditation and then callous execution clearly outweigh any mitigation factors and warranted the imposition of the death penalty for each conviction." The record supports that decision. It reflects that the weight of the aggravating circumstances completely overwhelmed the mitigating circumstances in each case.

Finally, even if our review of Pennell's sentence was limited to the killings to which he entered pleas of *nolo contendere,* leaving aside the earlier convictions, the circumstances of the deaths of Kathleen Meyer and Michelle Gordon would support the imposition of the death penalty. The cruel and outrageous nature of the deaths of these helpless women, when compared with the "universe" of Delaware cases, demonstrates the appropriateness of the imposition of death, without consideration of any prior conduct on the part of Pennell.

*Conclusion*

This Court has determined that the facts supporting the sentences of death, which were imposed upon Pennell by the Superior Court judge, for the murders of Michelle Gordon and Kathleen Meyer, are so clear and convincing that virtually no reasonable person could differ. *Accord Dobbert v. Florida,* 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). This Court concludes that the death sentences imposed upon Pennell "are not comparatively disproportionate to the sentences in the other first degree murder cases that have proceeded to a penalty hearing pursuant to the Delaware capital punishment statute, and in which at least one statutory aggravating circumstance was found to exist by the jury." *Dawson v. State,* 581 A.2d at 1109. Therefore, the judgments of the Superior Court, which resulted in Pennell's convictions and the imposition of the death sentences, are AFFIRMED.

The matter is remanded to the Superior Court for further proceedings, in accordance with this opinion. The parties shall have until February 26, 1992 to file motions for reargument.[8] This Court's order of November 6, 1991, staying the execution of Pennell's death sentences, shall terminate upon the issuance of this Court's mandate. The Clerk of this Court is directed to cause a copy of this opinion to be hand-delivered forthwith to the parties and to the Commissioner of the Department of Correction.

## APPENDIX I

### FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS SINCE 1985

Case Name: William P. Baynard
Case No.: S84–050137, 0141
County: New Castle
Sentence: Life Imprisonment

Case Name: Ransford Bryan
Case No.: S87–11–0063
County: Sussex
Sentence: Life Imprisonment

---

**8.** Chief Justice Andrew D. Christie will retire on February 29, 1992. Therefore, the time in which to file motions for reargument in several pending matters, including this one, has been abbreviated to seven (7) days pursuant to a separate order.

Case Name: Vicky Chao
Case No.: IN88–031025–1025 & 1027, 1028
 IN88–0832–0836
County: New Castle
Sentence: Life Imprisonment

Case Name: Carmelo J. Claudio
Case No.: IN87–030067–68
County: New Castle
Sentence: Life Imprisonment

Case Name: Lawrence R. Collingwood, Jr.
Case No.: K87–09–0895–0901
County: Kent
Sentence: Life Imprisonment

Case Name: David F. Dawson
Case No.: IK87–010834 thru 0847
County: Kent
Sentence: Death

Case Name: Kenneth W. DeShields
Case No.: IS84–080075–1075, –1275, –2075
County: Sussex
Sentence: Death

Case Name: Sebron Ernest Flemming, III
Case No.: IN90–09–1047
County: New Castle
Sentence: Life Imprisonment

Case Name: Edward A. Fountain, Jr.
Case No.: IN84–120293 through 0297
 IN84–121795 through 1797
County: New Castle
Sentence: Life Imprisonment

Case Name: Randolph Graham
Case No.: IK86–010059
County: Kent
Sentence: Life Imprisonment

Case Name: James E. Harris, Jr.
Case No.: IN90–08–0479; 0498
County: New Castle
Sentence: Life Imprisonment

Case Name: Charles K. Kelly
Case No.: IN85–10–1671, 1672, 1673
County: New Castle
Sentence: Life Imprisonment

Case Name: Tze Poong Liu
Case No.: IN88–03–1013 through 1015
 IN88–04–0838 through 0840
County: New Castle
Sentence: Life Imprisonment

| | |
|---|---|
| Case Name: | James Edward Llewellyn |
| Case No.: | IN91-01-1135, 1137, 1140 and 1142 |
| | IN91-01-1136, 1138, 1141, 1143, 1146 |
| | IN91-01-1139 and 1144 |
| | IN91-01-1145 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Christopher Delamore Long, Jr. |
| Case No.: | IN91-01-1109 through 1121 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Joyce L. Lynch |
| Case No.: | IK88-010040 |
| County: | Kent |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Stanley Newell |
| Case No.: | IN89-006109 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Ernest Charles Parson, Jr. |
| Case No.: | IN86-120380, 86-11136-1137 |
| | IN86-1144, 1147, 0381-0383, 1135 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Steven B. Pennell |
| Case No.: | IN88-120051-0053 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Steven B. Pennell |
| Case No.: | IN91-07-0114; 0015 |
| County: | New Castle |
| Sentence: | Death |

| | |
|---|---|
| Case Name: | Vincent Perry |
| Case No.: | IN85-101668-1673 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Maurice Polk |
| Case No.: | S87-12-0093 |
| County: | Sussex |
| Sentence: | Life Imprisonment |

| | |
|---|---|
| Case Name: | Paul Arnold Robertson, Jr. |
| Case No.: | IN91-01-1148 through 1160 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

Case Name: Kenneth Louis Rodgers
Case No.: IN91–01–1109 through 1160
County: New Castle
Sentence: Life Imprisonment

Case Name: Frederick James Roop
Case No.: IN84–101691, 1692
County: New Castle
Sentence: Life Imprisonment

Case Name: Reginald N. Sanders
Case No.: IK86–030898 through 0903
County: Kent
Sentence: Death—Reversed and Remanded for a new penalty hearing

Case Name: Christie C. Shipley
Case No.: IK85–020820 and 0821
County: Kent
Sentence: Life Imprisonment

Case Name: Melvin Smart
Case No.: S84–08–0037 and S84–08–0038
County: Sussex
Sentence: Life Imprisonment

Case Name: Desi Sykes
Case No.: IK88–11005
County: Kent
Sentence: Life Imprisonment

Case Name: Richard C. Thompson
Case No.: IK86–010059
County: Kent
Sentence: Life Imprisonment

Case Name: Frank C. Whalen, Jr.
Case No.: IK77090035, 0036; IK78–030029
County: New Castle (venue changed)
Sentence: Life Imprisonment after two prior death sentences were reversed.

Case Name: Lonnie Williams
Case No.: IN89–08–0638 through 0645
 IN89–09–0938 through 0943
County: New Castle
Sentence: Life Imprisonment

APPENDIX II

IN THE SUPREME COURT STATE
OF DELAWARE

Steven B. Pennell

vs.

The State of Delaware

. No. 407, 1991

February 11, 1992

BEFORE: Chief Justice Andrew D.
Christie

Justice Henry R. Horsey

Justice Andrew G.T. Moore, II

Justice Joseph T. Walsh

Justice Randy J. Holland

APPEARANCES:

Richard E. Fairbanks, Jr., Esq. On behalf
of the State of Delaware

Steven B. Pennell

Appearing pro se

Joseph Bernstein, Esq.

Stand-by counsel for Defendant

February 11, 1992

February 11, 1992
Courtroom No. 1
2:00 p.m.

JUSTICE CHRISTIE: The Court is as-
sembled this afternoon to hear argument in
the automatic appeal in the case of Pennell
versus the State. We understand that Mr.
Pennell represents himself, having waived
the right to have an attorney, and that it
has been explained to him that he would
make the first presentation, and that he
could reserve part of the half hour for
rebuttal, and that he has chosen to reserve
as much as 20 minutes for his initial pre-
sentation, and ten minutes for the rebuttal.

Mr. Pennell may now proceed.

MR. PENNELL: Thank you.

Chief Justice Christie and Justices of the
Supreme Court of Delaware. Good after-
noon, gentlemen.

I would first like to express my gratitude
in allowing me to appear before this Court,
because I know of this Court's policy of not
allowing pro se litigants. So, again, I say
thank you.

In my presentation before this Court to-
day, I will attempt to show that the death
penalty imposed in this case was not the
product of passion, prejudice or other arbi-
trary factors, in that the trial Judge at
each step of the proceedings advised of the
seriousness of the criminal charges, that
certain rights existed that could be benefi-
cial, such as the right to counsel, the right
to a jury trial, and so on. That after the
finding of guilty beyond a reasonable
doubt, the Trial Judge showed no abuse
because of discretion, nor determined in an
unreasonable manner that, one, the two
statutory aggra—excuse me, aggravating
circumstances put forth by the State exist-
ed beyond a reasonable doubt.

Two, that although no mitigating factors
were offered, he chose to exercise judg-
ment in including factor that he knew exist-
ed.

And, three, that after careful weighing
of each of these circumstances, concluded
that the aggravating circumstances sub-
stantially outweighed any mitigating
factors, and that this determination, along
with the circumstances of the crime, the
character and the propensities of the de-
fender, directed that the death penalty was
appropriate.

Furthermore, in this case, the factual
circumstances, plenty so, that the death
sentence is not proportionate to penalties
imposed in similar cases under Delaware's
Death Penalty Statute.

After being indicted on two charges of
first degree murder, a plea was offered to
the State and the Court. As part of this
plea, it was stated that the imposition of
the death penalty would not be opposed but

rather sought. In circumstances such as this, it would be very easy to quickly accept this type of a decision after minimal attempt in advising the defendant otherwise. Passions, prejudices are not acting upon one's own will, instead upon reasoning and exercise of judgment could become the determining factor in accepting and acting on such an offer.

But in this case, the Trial Judge acted cautiously and with a constant exercise of careful judgment. The record will show that numerous attempts were made to be sure that this decision was made willingly, knowingly, and intelligently. In such a plea—and that the Trial Judge's proceedings showed in accepting such a plea that every opportunity was present to withdraw if it was decided not go forward with such a plea.

Furthermore, the Trial Judge stated that any motion to withdraw such a plea would be looked upon favorably, not only before sentencing, but after sentencing as well.

Acting in such a way as the Trial Judge did shows that his motivations were not willful and unreasonable action done without consideration, nor that it was in disregard of facts or laws or determining principles. This is stated only so that the record reflects that there is a foundation that the Trial Judge did not act in any way that might show arbitrariness, capriciousness, before, and especially during, the penalty phase of the trial—case.

Now, turning to the issues of this review, in accordance with 11 Delaware Code 4209(g)(2), this Court must examine pertinent parts of the penalty hearing, a determination must be made on whether the evidence supports the Judge's findings of statutory aggravating circumstances.

Two aggravating circumstances were found. The first, of conduct resulting in the deaths of two or more persons.

This is established from the Judge's findings of guilty on each of the two counts of first degree murder. This Court has upheld in the past that when jury or Judge has found a defendant guilty of first degree murder of two victims in the guilt phase of trial, then the aggravating circumstances of causing the deaths of two persons has been established beyond a reasonable doubt.

Besides being found guilty of the deaths of these two persons, there was also the previous related two convictions of causing the deaths of two others which was upheld by this Court.

In that opinion expressed by this Court, it was stated that the evidence is overwhelming in connection with the death of Katherine DiMauro, and likewise the evidence was sufficient to sustain the conviction for the murder of Shirley Ellis. Due to the State's claim that these were serial murders, and the evidence linking them to each other, one cannot be viewed without the other. Thus, the first aggravating circumstance is substantially supported by the evidence.

The second statutory aggravating circumstance found that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture. In the past, this type—excuse me. In the past, this type of aggravating factor has been debated as being vague. That is not an issue here, in that the evidence and testimony supports its description sufficiently.

This factor can probably be defined best by looking at a parallel statute in other states where an accused committed the offense in an especially hideous, cruel or depraved manner, and explained by crime which is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death. Including in this, a victim's uncertainty as to her ultimate fate, and in a depraved manner where there is evidence of debasement, or perversion, or indifference to the suffering of the victim.

The Trial Judge stated in his findings after a penalty hearing that Michelle Gordon was held captive, alone and afraid, bound hand and foot, was tortured, mutilat-

ed, and that she experienced terror, fear, pain, and hopelessness before she died. He also stated the related cases of Catherine DiMauro and Shirley Ellis showed they were tormented and murdered in a similar fashion.

The evidence, photographs of the victims and testimony, Medical Examiner's conclusions, shows that Gordon, as well as the related victims, were tortured while bound and helpless before their deaths. This infliction of extreme pain was beyond that necessary to accomplish the underlying killing. The perpetrator must have sensed a pleasure in the killings, if as the State claims that these were serial killings, killings that were done by one person. Since he did not commit just one, but continued the same depraved manner on the others, this pleasure is evident.

Again, the record supports the Judge's findings that evidence established beyond a reasonable doubt that these murders were outrageous or wantonly vile, inhuman, in that it involved torture. The factual circumstances of these crimes plainly suggests that the trial Judge's findings of these two statutory aggravating circumstances should be upheld.

The Trial Judge, after concluding that aggravating factors indeed existed, then found mitigating factors, even though none were offered. The Trial Judge drew on his knowledge of the case to conclude that the defendant has a supportive family, and that until these incidents had been a substantial provider for his family, as well as a father, a husband, and a son.

After weighing these two factors, along with the circumstances of the crimes, and the character, record, an propensities of the defendant, he concluded that the aggravating circumstances, along with the circumstances of the crime, clearly outweighed the mitigating factors.

This determination was not made in an arbitrary or capricious manner, but according to the Laws of Delaware, a reasonable trier of the facts would conclude the same.

The Trial Judge's decision was competently made through his use of specific and detailed guidance and training throughout his career. As he did before the penalty hearing, and during the hearing, the trial Judge acted cautiously, and exercised judgment in concluding that since the aggravating factors outweighed the mitigating factors, and that the imposition of the death penalty was appropriate in this case. The sentence was a matter within sound discretion of the Trial Judge, that was not beyond statutory or Constitutional limits, and should not be reversed by this Court.

In determining whether a sentence imposed was arbitrarily or capriciously, this Court needs only to review that the statutory scheme or procedure to ensure that it was not. Our statute was modeled after the Georgia Death Statute which the U.S. Supreme Court upheld because it suitably directed and limited so as to minimize wholly arbitrary and capricious action.

This determination, plus the record, reflects the Trial Judge did not impose in any unreasonable manner; that it was indeed fair, solid, and with adequate determination resting on substantial cause.

The final determination for this Court is whether the sentence is disproportionate to the penalties imposed in similar cases conducted under the Delaware Statute. In comparing this case to the others in Delaware's universe of cases, which was established in Flamer, Riley and Dawson, this Court will find again an unrevoked, cold-blood murder of a person or persons who lacked the ability to defend themselves.

Two objective criterias should be used by this Court in making this determination. One, the gravity of the crime; and, two, the sentences imposed in other death penalty cases.

In addressing the gravity of the offense first, it has been established that these women were tortured, exposed to physical and mental anguish far beyond that accompanying a normal death. The trial Judge stated that these crimes were the most egregious as possible. That the enormity

of these two crimes, their cold premeditation, and their cowardice execution, clearly outweigh any mitigating factors.

This case, similar to other death penalties cases, goes even one step further, considering the way the circumstances were repeated again, and again, and again.

The gravity of this offense is within the category of extremely serious crimes for which prosecutors constantly seek, and juries constantly impose, the death penalty.

As this Court stated in Whalen, and is appropriate here, given the Death Statute, requiring a reckless state of mind, which can be proved by intentional conduct, and the facts of this case, one could hardly say that a death penalty is disproportionate.

And, gentlemen, that's my position on this whole thing. It is also my position that I hope this Court will affirm the decision by showing that it was not arbitrarily or capriciously imposed, and that the imposition was not disproportionate to sentences imposed in other cases.

Matter of fact, it—in my opinion of this case comparing this case to the others, the others might be disproportionate.

So, gentlemen, that's my position.

JUSTICE CHRISTIE: Very well, your remarks have been noted. We will now hear from the State.

MR. FAIRBANKS: May it please the Court. It is perhaps an unusual and, frankly, unique position to be here before this Court in the case in which the State and the defense are in total agreement. This Court's automatic review is set forth by statute and its limited review.

This Court essentially is asked to answer two questions. One, whether or not the statutory aggravating circumstances found by the Trial Judge, ultimate sentencer in this particular case, was proven beyond a reasonable doubt. And, two, whether there's evidence of arbitrariness or capriciousness in the imposition of the death penalty, or was it disproportionate.

I think the answer to all of these questions is clear. Steven Pennell appears before this Court having been convicted in this particular case by plea of nolo contendere of two first degree murders involving two women Kathleen Meyer and Michelle Gordon.

He also stands before this Court having been convicted of the brutal killing of two other women, Shirley Ellis and Catherine DiMauro.

All of these crimes, and certainly with the possible exception of Miss DiMauro, whose body was in no condition for us to determine precisely the manner of her death, these women were all tortured, and these killings were all deliberate instances in which Mr. Pennell went out, obtained and sought—looked after these women, brought them into his van, or other vehicle, took them off, tortured them, mutilated them, in a undescribably horrible and cold, calculating way, and then finally killed them.

The one victim in this case, Michelle Gordon, is perhaps the luckiest in a strange way. She died under torture, and so that the ultimate and complete act of torture that Pennell had planned for her was—as evidenced by his conduct with Ellis and DiMauro, was not fully completed, and that he ultimately mutilated her in part after her death. However, what is clear is that these were very violent, serious serial killings.

To move on quickly to the statutory review process by this Court, the first case this Court is asked to determine whether or not the statutory aggravating circumstances were found beyond a reasonable doubt. There can be no question that both the statutory aggravating circumstances found in this case were established beyond a reasonable doubt.

First of all, the first statutory aggravating circumstance which applies to both Gordon and Meyer, was that during the during a course of conduct, Mr. Pennell's conduct resulted in the death of two or more people. That's clear.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

As the State's expert in the original trial, which was made part of the record in this Court, made clear, these crimes, including the Gordon crime, was part of a serial killing. It was all done by the same individual, done in pattern, with a single individual responsible for—for all of these killings.

So that there's no question, and indeed his conviction by plea of nolo contendere established in this particular case, as this Court ruled in Bailey, that there were a course of conduct involving more than—two or more people.

The second statutory aggravating circumstance, and this applies only to Gordon, because Meyer, the body unfortunately was decomposed to a point in which we could not fully determine what occurred to her. Gordon, the medical testimony was that she, in effect, had been frightened to death. Mr. Pennell had started to engage in torture, had beaten her; however, because she had some cocaine in her system, her heart, with the added adrenaline, caused by the torture that he was undertaking upon her, she had been bound, and then beaten severely on the buttocks, that her heart simply gave out. She died, quite literally, under torture. There is no question that someone who is killed in such a manner has committed a crime in an utterly vile, horrible and inhuman manner that involved torture. And it is that statutory aggravating circumstance that the State established, and is that statutory aggravating circumstance which is clearly Constitutional.

The second prong of this Court's analysis is whether or not the sentence was imposed in an arbitrary, capricious manner, or whether it was disproportionate.

The evidence here is fairly clear. There is no evidence on this record of arbitrariness or capriciousness in the Trial Court's conduct. As Mr. Pennell points out, at every point during this proceeding, the Trial Judge gave Mr. Pennell the benefit of the doubt. He looked ultimately at the nature and consequences of these crimes, and in fact went further than Mr. Pennell did in expressly finding statutory—excuse me, nonstatutory mitigating circumstance to which Mr. Pennell offered no evidence. But that the Trial Judge had in the record as a result of the prior trial, and prior penalty hearing. As to proportionality, the evidence is quite clear.

This case is a little different for two reasons. One, serial killing of this nature, and torture of this nature, is fairly unique. Fortunately, unique in the eyes of the Delaware Death Penalty Statute, this Court has not had to face this type of crime. It is unique, but not disproportionate.

Secondly, this case is somewhat unique, because Mr. Pennell has gone through now two penalty hearings. In the first penalty hearing, the jury was unable to agree on the death penalty and thus he was sentenced to life for the death of Ellis and DiMauro.

This second penalty hearing is not disproportionate to that penalty hearing which is part of the universe upon which this Court is directed to examine. Because now he stands—there are significant differences. Now he stands convicted, not of two murders, but of four murders. All done in essentially the same manner, in serial fashion, having gone out, secured victims, bound them up, tortured them, and killed them. There is no question that these are proportionate in any real sense of the word.

This Court has noted that comparing capital case is like comparing proverbial apples and oranges. That is particularly true in this case. This case is unique, but this case is one which as the Trial Judge found is so horrible, is from a defendant who has committed so many murders, that there is but not one answer to that question and that is that it is proportionate to all sentences imposed in death in this state.

I have nothing further. Thank you, Your Honor.

JUSTICE CHRISTIE: Mr. Pennel, do you have further remarks you wish to make to the Court.

MR. PENNELL: Yes, I do.

JUSTICE CHRISTIE: You may come forward and make them.

MR. PENNELL: I will be very brief on my remarks in reply. It's been my position, as this Court knows, that I do not oppose the death penalty in this case that I rather sought the penalty myself. It was my decision, which the Court checked, and decided that it was willing, and it was an intelligent decision, to put a plea in in nolo contendere, and allow the death penalty to go forward.

It is my hope that this Court will affirm this decision without a delay, and for that reason, as this Court well knows, I have put a motion in. Just to add to the record, that I am competent, that I am intelligent enough to make a decision to waive any and all rights that I may have within the State, and within the United States Courts.

It is my request, my wish, to go further—to go on with this as quickly as possible, and not to take up any more of this Court's time.

I will ask if the Court does have any questions concerning the motion, I would be willing to answer it now, or we could just let the Trial Judge handle it once the case, if affirmed, is remanded back for resentencing.

JUSTICE CHRISTIE: The Court has no questions. Your remarks are noted. The Court will take this case under consideration. You may be seated.

MR. PENNELL: Thank you, gentlemen.

JUSTICE CHRISTIE: The Court will announce a decision promptly in connection with this matter, and the Court will stand adjourned.

(Recess taken at 2:25 p.m.)

State of Delaware:

SS:

New Castle County

I, Julie A. Chapin, Official Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the testimony adduced and proceedings had, as reported by me in the Supreme Court of the State of Delaware, in the case therein stated, as the same remains of record in the Office of the Prothonotary at Wilmington, Delaware, and that I am neither of counsel nor kin to any party or participant in said action nor interested in the outcome thereof.

WITNESS my hand this 14th day of February A.D., 1992.

_____

Julie A. Chapin, RPR–CM
Official Court Reporter